2020 IL App (1st) 180064-U

No. 1-18-0064

Order filed November 19, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 19919 |
| | ) | |
| MANUEL GONZALEZ, | ) | Honorable |
| | ) | Arthur F. Hill Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Hall concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for second degree murder and aggravated discharge of a firearm are affirmed because a reasonable factfinder could have found he did not establish self-defense. Defendant's sentences were not excessive where they were within the statutory range and the trial court appropriately balanced the mitigating and aggravating factors.

¶ 2    Following a jury trial, defendant Manuel Gonzalez was found guilty of one count of second degree murder (720 ILCS 5/9-2 (West 2012)) and two counts of aggravated discharge of a firearm

(720 ILCS 5/24-1.2(a)(2) (West 2012)) (aggravated discharge).[1] The trial court sentenced defendant to concurrent prison terms of 18 years for second degree murder and 14 years for each count of aggravated discharge. He appeals, arguing that the verdicts were not supported by the evidence because he acted in self-defense, and that his sentences were excessive in light of the mitigating factors. We affirm.

¶ 3 Defendant was charged by a 60-count indictment with multiple offenses arising from an incident on September 14, 2013, in Chicago. The State proceeded on count XVI for first degree murder of Miguel Delgado (720 ILCS 5/9-1(a)(2) (West 2012)) and counts LVI and LVII for aggravated discharge against Jason Cabada and Ricardo Morales, respectively. The evidence at trial included video exhibits entered by both parties, which are included in the record on appeal and have been reviewed by this court.

¶ 4 At trial, Alex Espinoza and William Guajardo testified they were seated in a vehicle near the 1500 block of North Milwaukee Avenue in Chicago on September 14, 2013, at approximately 2:20 a.m. Espinoza and Guajardo each noticed an altercation on the street during which a person discharged a firearm. Both men filmed the incident on their cell phones and provided the footage to the Chicago Police Department. The State published the videos by Espinoza (People's Exhibit 3) and Guajardo (People's Exhibit 3A), and each man testified that his respective video accurately portrayed the incident.

¶ 5 Joseph Cline, a bouncer at Nick's Beer Garden (Nick's) on the 1500 block of North Milwaukee, testified that on September 14, 2013, he was outside checking identifications when he heard "a large pop sound." He looked across Milwaukee and saw a man, whom he identified in

---

[1] Defendant's mittimus incorrectly states that he was found guilty of first degree murder.

court as defendant, pointing a firearm at another man. Defendant lowered his hand, then raised it and fired three shots north towards Damen Avenue. Defendant had been near the bar earlier that evening, but did not enter because he did not have his identification. Police officers arrived approximately 10 minutes after the shooting. Cline identified defendant on the scene and in a lineup at the police station later that day.

¶ 6    Prior to his testimony, Cline reviewed footage from the surveillance camera outside Nick's, which worked properly the night of the shooting, and verified that it accurately depicted the night's events. The State then published a portion of the video, People's Exhibit No. 9. The video depicts people walking along the sidewalk and entering and exiting Nick's. Cline identified himself, defendant, and defendant's friends in the video.

¶ 7    On cross-examination, Cline testified that he also saw defendant and his friends drink beer outside Nick's prior to the incident. He did not recall seeing Delgado or his friends before the incident, and denied telling a detective that he saw Delgado walking northbound on Milwaukee.

¶ 8    Cabada testified that he had a pending firearm case at the time of trial, and denied he was in a gang. On September 14, 2013, he and his friends Delgado and Morales went to the 1500 block of North Milwaukee. At some point, Cabada was standing across the street from Nick's when three men approached and asked if he "was gang affiliated." One man, whom Cabada identified as defendant in court, wore black. Another man, later identified as Jorge Orellana, wore a gray sweater, and the third, later identified as Alejandro Castro, wore a "long baggy red shirt."[2]

---

[2] Defendant, Orellana, and Castro testified during the defense's case-in-chief and confirmed the clothing they wore on the night of the incident. Their identities are not at issue.

¶ 9    Cabada told the men that he was not gang affiliated. Delgado and Morales then crossed the street to Cabada's location. Defendant "kept on saying are you sure you're not gang affiliated?" and "Do you want to see a gun?" while holding his hand in his back pocket. At this point, Orellana tried to stop the confrontation while Delgado and Castro paced. Cabada denied that he, Morales, or Delgado was armed.

¶ 10    Cabada kept his hands in his pockets and argued with Castro. Then, Cabada pulled his hand from his pocket, extended his arm while holding his phone, and said, "I told you, we don't gang-bang." Defendant, Castro, and Orellana rushed at Cabada, and Delgado reacted by punching Castro. Defendant then shot Delgado.

¶ 11    After defendant fired, Cabada and Morales ran north on Milwaukee. Defendant fired three more shots at them. As Cabada ran, one shot hit a window and glass fell on him. At Damen and Milwaukee, police officers stopped and handcuffed Cabada and Morales. The officers took Cabada back to the scene, and then to the police station. After Cabada's release, he and Morales returned to the police station, and Cabada identified defendant and Castro in a lineup.

¶ 12    The State published People's Exhibit No. 3A. The video begins with a group of men standing in a circle, apparently speaking to each other.[3] Castro and Cabada separate from the circle and walk towards the sidewalk to their right. Cabada steps onto the sidewalk, and Morales follows and stands next to Cabada. Orellana, Castro, and defendant stand in the street at this point, while Delgado moves behind them and leaves the frame. Cabada removes an object from his pocket, points it at Castro, then puts the object back in his pocket. Castro, who is facing Cabada, flinches when Cabada points the object, while defendant, who initially looks away, turns towards Cabada

---

[3] The video has an audio component, but the words exchanged by the men in the circle are inaudible.

while he is still pointing the object at Castro. After Cabada returns the object to his pocket, Castro and defendant walk towards Cabada. Delgado enters the frame and punches Castro from behind. Almost immediately, defendant draws a firearm and shoots Delgado, then aims towards the sidewalk and fires.[4]

¶ 13    On cross-examination, Cabada denied telling Chicago police personnel he was a gang member on previous occasions in 2013, 2014, and 2017. Cabada also denied telling defense counsel on February 17, 2016, that he was not a gang member on September 14, 2013, because he quit the "GD" gang three months prior.

¶ 14    Cabada agreed that he was "drunk and high" prior to the incident. His group consisted of himself, Delgado, Morales, and one of Delgado's friends. When defendant and his companions first approached Cabada, they displayed gang signs and asked Cabada what gang he was in, at which point Cabada denied gang involvement. Delgado's friend accompanied Delgado and Morales when they approached Cabada after seeing him involved with defendant's group.

¶ 15    Counsel then published a video marked Defense Exhibit No. 2, a reduced-speed version of People's Exhibit No. 3A. Cabada identified himself, defendant, Morales, and Castro in the video, and agreed that it does not show Orellana, Castro, or defendant making gang signs. Cabada denied that the video showed him drawing a firearm and pointing it at Castro, but said it was possible that Castro thought Cabada was armed when Cabada pointed the cell phone.

¶ 16    Cabada further testified that Castro covered his face with his arms when Cabada pointed the cell phone. Cabada interpreted this as showing Castro's willingness to fight, not that he was

---

[4] People's Exhibit No. 3 depicts the same incident, but runs for a moment longer. Defendant can be seen aiming the firearm towards Cabada as Cabada runs north on Milwaukee. Defendant fires a shot that shatters a glass storefront window.

trying to shield himself. Cabada believed that Castro's friends then approached him because they thought he punched Castro. After the police detained Cabada and brought him to the station, he did not tell them that he pointed his cell phone at anyone. Cabada testified that Castro "provoked everything."

¶ 17    On redirect, Cabada testified that defendant and Castro both made gang signs that Cabada believed represented the Latin Kings. Cabada denied belonging to the Latin Kings, Imperial Gangsters, La Raza, or the Gangster Disciples, or telling police officers he was a member of those gangs. Cabada had one hand in his pocket when the men first approached him. Defendant had his hand in his pocket as well.

¶ 18    Morales testified that he had a pending felony case for possession of a firearm and a controlled substance, and belonged to the Imperial Gangsters street gang. On September 14, 2013, at approximately 2:20 a.m., he, Cabada, Delgado, and Delgado's friend "Rusty" were outside of a bar on Milwaukee when Cabada left the group. Morales looked across the street and saw three people he did not recognize—later identified as Orellana, Castro, and defendant—approach Cabada. Morales and Delgado ran towards Cabada. Neither Morales, Cabada, nor Delgado was armed. Morales identified defendant in court.

¶ 19    Castro said, "King love, Folks killer," while Orellana tried to tell the others to stop. At some point, defendant said, "You want to see a gun?" After five minutes, Delgado punched Castro. Defendant then drew a firearm and shot Delgado, who "dropped instantly." Defendant "continued shooting," and Morales ran north on Milwaukee with Cabada. Police arrived and handcuffed Cabada and Morales, took them back to the scene, and then to the police station. The police

released Morales, and later that day, Morales and Cabada returned to the station voluntarily to speak with a detective. Morales viewed a lineup in which he identified defendant and Castro.

¶ 20    On cross-examination, Morales acknowledged that People's Exhibit No. 3A shows Cabada raising his right arm with his hand facing straight out, and his left hand on his right shoulder. Morales agreed that Cabada pointed an object at Castro, but said the object was a phone, not a firearm. Other people nearby jumped back when they saw Cabada point the cell phone. Defendant first fired at Delgado, then at Cabada, and continued firing after that.

¶ 21    Morales denied that he was participating in gang activities that evening. He acknowledged speaking to defense counsel before trial, but denied telling him that two groups of men "gang banged at each other for about 3 minutes before the shooting." Morales did not "claim" or "represent" that he was an Imperial Gangster on the night of the incident, and denied that Cabada was an Imperial Gangsters member. The other men were making gang signs at Morales and his friends, but they did not reciprocate. Morales acknowledged that he drank Hennessey and smoked marijuana on the evening of the incident, but denied that he was drunk or high.

¶ 22    Castro testified that immediately before the shooting, Cabada took something from his pocket and pointed it at Castro. At first, Castro thought the object was a firearm, which he told the police at some point. A detective who picked Castro up at the crime scene stated the object was a cell phone. Castro testified that he told detectives during an interview at the police station that he thought Cabada pointed a firearm. The State then published video of a portion of Castro's electronically recorded interview (ERI), marked as People's Exhibit No. 40. In the video, Castro states that Cabada pointed a cell phone at him, and he knew Cabada did not have a firearm.

¶ 23    On cross-examination, Castro testified that he first interacted with defendant that night when Castro saw defendant with Orellana outside Nick's. Castro asked defendant for a cigarette, then returned to the bar with Orellana. At some point, Orellana went back outside. Shortly thereafter, Castro overheard others mentioning that a fight was occurring across the street.

¶ 24    Castro went outside and saw at least eight men in a circle. Castro went into the middle and stood in front of Orellana, who was talking to two "younger guys." Castro could not see defendant at this point. The other group was "[g]ang banging," and their hands were in "their waistline." Castro believed the men were "[t]rying to grab something they're not supposed to have on them," and thought he and his friends were "gonna get hurt."

¶ 25    Castro flinched when Cabada pointed the object at him, and put his hands in front of his face because he thought it was a firearm. Cabada immediately put the object back in his pants. Castro approached Cabada, at which time Delgado punched Castro in the back of the head. Castro kept moving towards Cabada, but then heard gunshots and ran. He did not see who fired the shots. Police officers later arrested him and brought him back to the scene, where they conducted show-up identifications. Castro did not tell the detectives that he thought Cabada had a firearm because "they got in [his] head since the beginning and told me it was a cell phone."

¶ 26    Chicago police sergeant Jesus Enriquez testified that on September 14, 2013, he and his partner Officer Michael Howe investigated a call of shots fired near Milwaukee and Honore Avenue at approximately 2:20 a.m. As they drove towards the area, they observed defendant on the steps of a house near the 1400 block of Wicker Park Avenue. Defendant matched a description that Enriquez had received over the radio, and Enriquez detained him after a conversation. Howe went to the yard next door, and returned with Castro in custody. The officers drove defendant and

Castro to the 1500 block of North Milwaukee. There, the officers separated defendant and Castro and conducted show-up identifications. Enriquez transported Castro to the police station. During the ride, they did not speak and Castro did not say that he thought someone had a firearm.

¶ 27    Chicago police officer Paul Presnell, a forensic investigator, testified that he filmed and photographed the crime scene, and collected evidence including four .380-caliber cartridge casings, a fired bullet in a piece of wood from a nearby storefront, and a cell phone on the ground next to Delgado's body.

¶ 28    Chicago police officer Otero[5] testified that he and his partner Officer Gloria Gomez were on patrol near Honore and Wicker Park when he heard what sounded like gunshots coming from the direction of Milwaukee. They drove towards the sound and observed a man running in an alley. The individual held his waistband and appeared to have blood on him. The officers detained the man, whom Otero later learned was Orellana. Witnesses on the scene identified Orellana as having been involved in the shooting incident. Otero and Gomez then drove Orellana to the police station.

¶ 29    Chicago police officer Miguel Cordero testified that he and his partner Officer Ricardo Rivera responded to the shooting at approximately 2:21 a.m. and observed Delgado on the ground. Cordero spoke to Cline and then sent out a "flash message" describing two males, one in a black shirt and one with a red shirt. Later, other officers arrived at the scene with two male suspects fitting that description, Castro and defendant. Witnesses identified them in a show-up. Cordero transported defendant to the police station. Around noon that day, Cordero returned to the scene to "look for more evidence." During the search, he observed a firearm near a downspout on the

---

[5] Otero's first name does not appear in the report of proceedings.

1400 block of North Wicker Park. A detective and evidence technician arrived, and the technician recovered the firearm, which Cordero identified as People's Exhibit No. 48.

¶ 30    On cross-examination, Cordero testified that detectives directed him to return to the 1400 block of North Wicker Park, the location of defendant's arrest. The detectives did not ask him to investigate a CTA station near where two other individuals were arrested.

¶ 31    Detective Mark Regal testified that he investigated the shooting on September 14, 2013. When he arrived on the scene he saw four .380-caliber cartridges near Delgado's body. He also saw a shattered window and a bullet lodged in the "trim" of a restaurant's door. Regal's partner Detective Ed Heerdt interviewed Cline on the scene. Frank Campbell, the owner of Nick's, provided Heerdt with video from that evening. Later that morning, Regal recovered a Facebook video of the incident posted by Espinoza. That day, Espinoza and Guajardo provided their cell phones to the police.

¶ 32    The State entered a stipulation that William Streff, an evidence technician for the Chicago Police Department, would testify that he recovered a .380-caliber firearm from the 1400 block of North Wicker Park. Forensic scientist Diana Pratt would testify that she received the .380-caliber firearm and four discharged .380-caliber cartridges. She test-fired the firearm, compared the cartridges from the test fire with those recovered from the scene, and concluded that the four recovered cartridges were fired by the recovered .380-caliber firearm.

¶ 33    The State entered additional stipulations that Dr. Kristin Escobar Alvarenga would testify that she performed an autopsy on Delgado and concluded the cause of death was a gunshot wound to the head and the manner of death was homicide, and that Delgado's toxicology exam revealed positive ethanol vitreous humor blood and central blood, but was negative for opiates.

¶ 34    The State rested, and the court denied defendant's motion for a directed verdict.

¶ 35    Orellana testified that on September 14, 2013, he was outside of Nick's bar looking for a cigarette when he saw defendant drinking beer across the street on Milwaukee. Orellana approached defendant and they talked for a few minutes. Orellana also encountered Castro around this time. The three tried to enter Nick's, but defendant was unsuccessful. Later, Orellana exited the bar because he saw a commotion and two individuals talking to defendant.

¶ 36    Orellana approached and tried to end the incident. The two individuals went north towards Damen. Orellana returned to the bar, but left again because "everything started escalating." He could not remember if Castro was with defendant at this point, but there were six to seven people in the area. Orellana tried to "diffuse the situation." The men in the other group, who looked very young, were saying gang slogans and trying to offend Orellana and his group. Orellana believed the young men were drunk. Orellana did not make gang signs, and did not see defendant or Castro make gang signs or hear defendant ask if the young men wanted to see a firearm.

¶ 37    At some point, Cabada pointed an object at Castro that "looked like a gun," and did so as if "he was holding a gun." Orellana flinched, and feared for his and his friends' lives. Cabada put the object in his pants, and almost "instantly," someone punched Castro. Orellana then heard shots, but did not know defendant fired them. Delgado fell in Orellana's arms. Orellana placed him on the ground and ran into an alley, where police officers stopped him. He stayed at the police station for 48 hours before his release.

¶ 38    On cross-examination, Orellana testified that he did not see where defendant went after he was unable to enter Nick's. He had never seen the young men before that evening. When Orellana

approached the second time, one of the men stated that "you guys probably are going to get jumped." The object Cabada held resembled a black firearm.

¶ 39    On redirect, Orellana testified that defense counsel visited his house before the trial. Orellana reviewed a cell phone video of the incident at that time, and determined based on the video that the object Cabada held was a cell phone. On recross-examination, Orellana acknowledged that a written statement created during this visit did not mention his realization regarding the object.

¶ 40    Defendant testified that he went with his brothers to the Wicker Park area on September 14, 2013. They drove to Nick's, but did not go inside immediately, and instead drank beer near their vehicle. Defendant saw Orellana and Castro, but was unable to enter the bar with them or his brothers, so he remained outside and finished his beer. At this point, two individuals who looked "pretty young" approached defendant and asked his "gang affiliation." Defendant had not been in a gang since the "mid-late '90s" and told the young men he was not in a gang, but they continued "harassing" him.

¶ 41    Orellana approached and told the young men to leave defendant alone. The young men walked away, and so did Orellana. Shortly thereafter, the young men returned with "several" additional people, including Delgado. Orellana left the bar and asked the young men why they came back. Defendant did not say much because he was "pretty much intimidated." Castro also arrived and told the young men to "back off." Defendant carried a .380-caliber firearm on him, but did not brandish it at this point. He was concerned the young men intended to "jump" him.

¶ 42    The young men continued making "gang threats." After a minute or two, Cabada pulled an "object" from his pocket, which caused Castro to flinch. Defendant was looking "sideways" at the

time, and observed that other individuals in the area had their hands at their waistline, which indicated to defendant that they may have had firearms.

¶ 43    Defendant believed Cabada had brandished a firearm because of "the way he pulled it out and the way he looked." While pointing the object at Castro, Cabada said, "King killer," which defendant interpreted to mean that Cabada believed defendant and his friends were Latin Kings, and Cabada intended to kill one of them. Defendant first felt shock, but then turned his attention to Cabada, who placed the object in his waistline.

¶ 44    Defendant took two steps forward because he did not want his back towards Cabada if he were to brandish the object again. At this point, someone came from defendant's left and hit Castro. Defendant "[i]nstantaneously" shot the person that hit Castro because his "mind was still on the guy who had a gun." Defendant believed his life was in danger and was also concerned for his friends. He did not believe Cabada was the only person carrying a firearm at the time because others had reached towards their midsections. After defendant fired at Castro, he turned towards Cabada and fired one shot at him, and also fired in the "direction" of "the other two guys." Defendant worried that Cabada would fire his weapon, and shot above the heads of the other men to "back them off." He did not intend to hit anyone.

¶ 45    After discharging the firearm, defendant ran down the first street off of Milwaukee. He was concerned about his safety due to the "other guys that I saw with a gun." He placed the firearm "by a little porch" because he did not want to have it on him when the police arrived. He then sat on the porch and waited for the police.

¶ 46    Defense counsel played Defense Exhibit No. 2 and questioned defendant regarding it. Defendant pointed out when Cabada "pulled his weapon out." Defendant had been looking toward

Orellana, but turned towards Cabada because he heard him yell "King killer." Defendant then approached with his hand on his weapon, disengaging the safety. He felt "scared" that he or his friends could be shot. The "only reason" he drew the firearm was that he thought he "had to" because someone had "pulled a weapon on" him.

¶ 47 On cross-examination, defendant admitted he falsely told the police he was standing in line at Nick's and ran after hearing gunshots, and that he did not know Castro. He believed Castro was a member of the Latin Kings street gang, and defendant and Orellana were members of the Latin Kings when they were younger. Defendant believed the young men assumed he was a Latin King because he wore a black shirt with gold trim, which are Latin Kings colors. Defendant did not purposefully wear Latin Kings colors that evening. When the young men returned, there were approximately seven of them, and they surrounded defendant. He denied asking the young men if they wanted to see a firearm.

¶ 48 Defendant stated that the object Cabada removed from his pocket was a firearm. When Cabada first pulled the weapon, defendant backed up half a step, then put his hand on his firearm in his front pocket and disengaged the safety. He did not draw his firearm at this point because Cabada "put it right away, put it back, but he kept his hand on it." Defendant approached Cabada "to get a better perspective" in case he would remove the firearm again.

¶ 49 On redirect, defendant testified that he carried a firearm that evening for protection because he lives in a dangerous neighborhood. On recross-examination, he testified that he did not own the firearm legally.

¶ 50 Officer Kartik Ramakrishnan testified that an arrest report from February 18, 2017, identified Cabada as a member of the Imperial Gangster street gang. On cross-examination,

Ramakrishnan testified that Cabada did not state he was a member of the gang, and instead was listed in the database as a documented gang member. On recross-examination, Ramakrishnan acknowledged that the report also listed Cabada as a La Raza associate.

¶ 51    Chicago police officer Daniel Torres testified that on August 19, 2013, he spoke to Cabada and learned he belonged to the Maniac Latin Disciple street gang. On cross-examination, Torres testified that he did not remember if Cabada told him that information or if he found it in the Chicago Police Department database.

¶ 52    Defendant entered a stipulation that Chicago police officer Pedro Hernandez would testify that following an interaction with Cabada on August 9, 2013, he completed a contact card that identified Cabada as a member of the Imperial Gangsters based on information in the Chicago Police Department database.

¶ 53    The defense entered another stipulation that if called, Kimyona Taylor, an investigator for the Cook County Public Defender, would testify that she interviewed Cabada and Morales on February 17, 2016. Cabada stated that he was outside of Nick's smoking a cigarette when three men approached and "started talking about gangs." Cabada told them he was not in a gang because he quit the "GD Gang" three months ago. Morales stated that the two groups "gang banged at each other" for "about three minutes prior to the shooting." Taylor would also state that she took a statement from Orellana. During the course of the conversation, Orellana stated he believed the object in Cabada's hand was a firearm, but after viewing slowed-down cell phone footage, he realized the object was a cell phone. This comment was not included in the statement.

¶ 54    During closing arguments, the State argued that defendant and Castro harassed Cabada about his gang affiliation. Orellana, Castro, and defendant initially retreated when Cabada pointed

the cell phone at them, but then realized it was a cell phone and "rushed" Cabada, prompting Delgado to punch Castro. The State argued the evidence showed that the men "knew it was a cell phone before they even got close enough to [Cabada] to engage him in a sort of a fight." The prosecutor also emphasized that Castro told detectives hours later that he knew Cabada did not have a firearm, and called Castro's testimony to the contrary an "absolute lie."

¶ 55    The State further argued that the evidence showed defendant did not have a "reasonable belief" that he needed to use deadly force against Delgado because defendant was not under any threat, and he was not justified in firing the three additional shots towards Cabada and Morales because they were "running away from him."

¶ 56    Defense counsel argued that defendant acted in defense of his friends, as the evidence showed Cabada pulled an object that "looked like a gun" and pointed it at Castro. Counsel further argued that Cabada and Morales did not testify credibly, and that Cabada's testimony that he said "we're not gang banging" while pointing his cell phone was "ridiculous." Counsel contended defendant shot Delgado after he "ambushed" defendant and Castro, and then shot at Cabada because he was concerned Cabada would "pull his gun back out and kill [defendant] and his friends."

¶ 57    In rebuttal, the State argued that after Delgado punched Castro, defendant was not justified to use deadly force because "[h]itting somebody with a fist in the back of the head is not commensurate with a gunshot to the head."

¶ 58    At defendant's request, the court instructed the jury regarding self-defense and second degree murder predicated on an unreasonable belief in the need for deadly force and serious provocation.

¶ 59    The jury found defendant guilty of second degree murder and two counts of aggravated discharge of a firearm.

¶ 60    The presentence investigation (PSI) report showed that defendant was 30 years old at the time of the incident. He had a prior conviction for driving under the influence of alcohol in 2012, for which his conditional discharge was terminated unsatisfactorily. He worked for his friend's heating and air conditioning business, and also worked temporary jobs from 2008 to 2013 and as a mechanic from 2000 to 2006. He denied gang involvement, saying he quit the Latin Kings when he was 13 years old, and reported a good relationship with his mother and siblings.

¶ 61    The Delgado family's victim impact statement stated that Delgado's death "devastated" them and changed their lives "completely." Delgado's mother attempted suicide twice, and her husband became an alcoholic, which caused him to lose his job. Delgado's sister, brother, and grandmother were also significantly affected by Delgado's death.

¶ 62    In mitigation, defendant offered letters from his family. His cousin wrote that she believed defendant could still contribute to society, and that her mother would open her home to defendant if he were given a "second chance." Defendant's aunt submitted a letter stating that defendant was respectful and about to start a "good job at the airport" at the time of the incident. She believed defendant was remorseful, and making changes while incarcerated. Finally, another aunt wrote that defendant faced challenges growing up because he showed signs of a learning disability, his mother suffered from mental illness, and his father abandoned him. She stated that because she has a master's degree in psychology, she believed she could help defendant better himself.

¶ 63    At the sentencing hearing, the court first denied defendant's motion for a new trial. The parties then presented the letters in aggravation and mitigation. Defense counsel further stated that

defendant struggled with alcohol abuse and did not graduate from high school or have his GED, but taught himself to read, sought jobs through temporary employment agencies, and was not "a lost cause." In allocution, defendant apologized to the Delgado family and stated he was "deeply sorry for everything that happened that night."

¶ 64 The court stated that it recalled the facts of the case "vividly," and citing the cell phone video of the incident, described the shooting as a "horrific crime on our streets." Additionally, the court noted that the Delgado family's victim impact statement was proof that their family had been "altered forever." The court stated it "considered all the factors" in "aggravation and mitigation," then sentenced defendant to concurrent terms of 18 years' imprisonment for second degree murder and 14 years' imprisonment on each aggravated discharge count.[6] The sentence for second degree murder was to be served at 50% time, while the sentences for aggravated discharge were to be served at 85% time. The court denied defendant's motion to reconsider sentence.

¶ 65 On appeal, defendant first argues that the State's evidence was insufficient to defeat his claim of self-defense as to each count on which he was convicted. The State responds that the jury's verdicts were reasonable because defendant did not establish the elements of self-defense.[7]

¶ 66 When reviewing the sufficiency of the evidence, the reviewing court construes the evidence in the light most favorable to the State and determines whether any rational factfinder could have found the defendant guilty beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. It is the factfinder's responsibility " 'to assess the credibility of witnesses, weigh the evidence

---

[6] On the same date as the sentencing hearing in the instant case, defendant pleaded guilty to a pending charge of aggravated driving under the influence of alcohol and was sentenced to a consecutive term of one year's imprisonment.

[7] In their briefs on appeal, neither party addresses the sufficiency of the evidence as to second degree murder predicated on serious provocation.

presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence.' " *People v. Ward*, 2011 IL 108690, ¶ 34 (quoting *People v. Moss*, 205 Ill. 2d 139, 164 (2001)). As such, the reviewing court will not substitute its judgment for that of the factfinder respecting the weight of the evidence or credibility of the witnesses. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The reviewing court may only reverse the jury's verdict if the evidence was so improbable, unreasonable, or unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 67    Defendant was charged, in relevant part, with first degree murder and aggravated discharge. As to first degree murder, the State was required to prove that defendant killed Delgado without lawful justification and, in performing the acts which caused the death, knew the acts created a strong probability of death or great bodily harm to Delgado. 720 ILCS 5/9-1(a)(2) (West 2012).

¶ 68    In response, defendant raised the affirmative defense of self-defense. "A person is justified in the use of force against another when and to the extent he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2012). To establish this affirmative defense, a defendant must present some evidence supporting the following elements:

> "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995).

¶ 69    A factfinder need not accept a defendant's claim that he acted in self-defense, and instead may consider the probability of the defendant's testimony, the testimony of other witnesses, and

the attendant circumstances when making its conclusion. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). If the State refutes one element of self-defense, the defense fails. *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 70    In this case, the jury rejected defendant's claim of self-defense but convicted him of second degree murder (720 ILCS 5/9-2 (West 2012)).

¶ 71    A second degree murder finding is appropriate where the defendant commits first degree murder, but a statutory mitigating factor is present. One such mitigating factor exists when a person acts under the belief that the use of deadly force was necessary to protect himself or others, but this belief was objectively unreasonable. 720 ILCS 5/9-2(a)(2) (West 2012). This defense is known as "imperfect self-defense." *Jeffries*, 164 Ill. 2d at 113. The State first must prove the defendant guilty of first degree murder. *People v. Thompson*, 354 Ill. App. 3d 579, 586 (2004). Next, the burden shifts to the defendant to demonstrate by a preponderance of the evidence that the first five factors of self-defense are present, but the defendant's belief was not objectively reasonable. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149. "The determination of whether a defendant is guilty of first degree murder or guilty of second degree murder or was justified because acting in self-defense is a question for the finder of fact." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 72    We first consider defendant's claim that the State did not refute that he acted in self-defense in shooting Delgado. The record shows that two groups of men had an altercation across the street from Nick's, with Cabada, Delgado, Delgado's friend, and Morales on one side, and defendant, Castro, and Orellana on the other. Witnesses from each side accused the other of making gang signs. Orellana and defendant acknowledged a history with the Latin Kings, but claimed they were no longer members. Defendant wore clothing with Latin Kings colors. Cabada also denied gang

membership, but multiple officers testified that his name appears in the Chicago Police Department database as belonging to various gangs. Witnesses from each group accused the other of provoking the altercation and making gang-related statements involving the term "kill." Defendant and Castro said others near the altercation had their hands in their waistline, indicating they might have been carrying firearms, while Cabada and Morales claimed defendant asked them if they wanted to see a firearm.

¶ 73    It is undisputed that at some point, Cabada took an object from his pants and pointed it towards Castro. Castro, Orellana, and defendant all testified that they believed the object was a firearm, though Castro told detectives in a videorecorded statement that he knew the object was a cell phone. Cabada denied that he had a firearm and also claimed the object was a cell phone. Orellana testified that though he believed the object was a firearm in the moment, he later recognized it was a cell phone after viewing footage of the incident. Defendant maintained at trial that Cabada had a firearm. There is no dispute that Cabada then put the object back in his pants.

¶ 74    It is also undisputed that Castro flinched at Cabada's initial action, but then he and defendant walked towards Cabada. Defendant did not remove his weapon or run from the scene when Cabada displayed the object. As Castro and defendant advanced towards Cabada, Delgado came from behind Castro and punched him in the head. Defendant then drew his firearm, shot Delgado, and shot at Cabada and Morales as they fled down the street. Defendant fled, hid his firearm, and falsely told police when he was arrested that he was in line at Nick's and not involved in the shooting.

¶ 75    Based on this record, we find that a rational factfinder could have found that the evidence did not establish a claim of self-defense, and instead supported a conviction for second degree

murder based on imperfect self-defense. Witnesses from each group provided conflicting testimony regarding who instigated the altercation, made accusations of gang involvement, and made threats. According to Cabada and Morales, they consistently stated they were not involved with gangs, but defendant asked them if they wanted to see a firearm and Castro threatened them. In contrast, defendant testified that Cabada said, "King Killer," and Castro testified that Cabada and his group were "gang banging" and grabbing their waistlines. The jury was tasked with deciding which version was more credible, and on review, we may not substitute our judgment for that of the factfinder regarding this determination. See *Jackson*, 232 Ill. 2d at 280-81. The jury here could reasonably credit Cabada's and Morales's account of the altercation over that of Castro, Orellana, and defendant, and in so finding, reject defendant's contention that he felt generally threatened by the situation prior to Cabada brandishing the object. See *People v. Guzman*, 208 Ill. App. 3d 525, 532 (1990) (rejecting the defendant's claim of self-defense where the State's witnesses "testified that the defendant was the aggressor" but "the defendant testified that the victim *** approached and shoved him," as factfinder could properly decide not to credit the defendant's version).

¶ 76    The record further supports the inference that when Cabada brandished the object, defendant knew it was a cell phone and not a firearm. Defendant moved towards Cabada after he brandished the item, Castro stated in his ERI that he knew the object Cabada pointed was a cell phone, and the police never found a firearm connected to Cabada. These facts combine to permit a reasonable inference that defendant knew before the shooting occurred that Cabada did not have a firearm, and thus did not pose a deadly threat to defendant or his friends. See *People v. Murillo*, 225 Ill. App. 3d 286, 293 (1992) (where "defendant testified to the fact that the victim actually

threatened him with a drawn pistol," "the fact that no gun was found" was "relevant towards materially impeaching defendant's version of the facts which he presented to justify a claim of self-defense.").

¶ 77    It follows that even if Delgado used unlawful force by punching Castro, there was no imminent threat to the lives of defendant or his friends from Delgado or Cabada that would justify defendant's use of deadly force in response to the punch, making defendant's act objectively unreasonable. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying such use of deadly force.").

¶ 78    Defendant relies on *People v. White*, 87 Ill. App. 3d 321 (1980), where the defendant claimed self-defense in a shooting. *White*, 87 Ill. App. 3d at 322. The evidence showed that the victim had cut the defendant with a knife before the day of the incident and, according to the defendant's unchallenged testimony, brandished a knife and threatened defendant immediately prior to the shooting, though no knife was recovered. *Id.* at 323-24. This court found that the trier of fact could reasonably determine the defendant appropriately used deadly force on the victim, even though no knife was located, reasoning that "it is not necessary for the deceased to have actually possessed or used a deadly weapon" because, "[i]f a person is confronted with such means or force as to induce a reasonable belief that he is in danger of loss of life or of suffering great bodily harm, that is all the law requires." *Id.* at 324. *White* is of limited usefulness here, though, because in *White* the defendant's account was unrefuted. Here, the evidence supports an inference that not only did Cabada not have a firearm, but defendant knew Cabada was unarmed before

defendant used deadly force against Delgado. Consequently, the jury could reasonably reject defendant's claim of self-defense and find him guilty of second degree murder.

¶ 79    Defendant further argues that he acted in self-defense in connection with the shots he fired after shooting Delgado, for which he was convicted of two counts of aggravated discharge. To establish aggravated discharge as charged here, the State had to demonstrate that defendant knowingly or intentionally discharged a firearm in the direction of Cabada and Morales. 720 ILCS 5/24-1.2(a)(2) (West 2012).

¶ 80    As discussed above, the jury could rationally conclude that defendant did not have an objectively reasonable belief that deadly force was necessary to defend himself or his friends after Delgado punched Castro, which would also render defendant's firing the additional shots objectively unreasonable. Moreover, the cell phone videos of the incident show Cabada and Morales fleeing, defendant does not dispute that the men were running away when he fired at them, and the physical evidence from the scene suggests defendant fired further down Milwaukee as Cabada and Morales fled. On this record, the jury could rationally conclude that defendant fired at Cabada and Morales as they fled, and thus did not act pursuant to an objectively reasonable belief that they still posed a threat to him. See *People v. Guja*, 2016 IL App (1st) 140046, ¶ 54 ("the right of self-defense does not permit one to pursue and inflict injury upon even an initial aggressor after the aggressor abandons the quarrel"). Consequently, defendant's affirmative defense also fails respecting these counts.

¶ 81    In sum, a rational factfinder could have concluded that defendant did not act with an objectively reasonable belief in the need for self-defense when he shot Delgado and then shot at

Cabada and Morales. As such, the jury's findings of guilt for second degree murder and aggravated discharge are affirmed.

¶ 82    Defendant next argues that his sentences were excessive because the court did not properly weigh the mitigating factors, including the circumstances of the offense, his criminal history, his family ties, and his remorse in allocution.

¶ 83    At sentencing, the court must consider both the seriousness of the offense and a defendant's rehabilitative potential. Ill. Const. 1970, art. 1, § 11. The sentencing court is given deference in its decision because it is in a better position than the reviewing court to assess the defendant's "credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Accordingly, the reviewing court will not substitute its judgment for that of the sentencing court because it may have weighed the relevant factors differently. *Id.* A sentencing court will be presumed to have considered all mitigating factors presented absent a positive showing from the record to the contrary. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. The seriousness of the crime is the most important factor at sentencing. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). A sentence within the statutory range will not be deemed excessive unless it is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999). The court's sentencing decision will not be overturned absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010).

¶ 84    Second degree murder is a Class 1 felony with a sentencing range of 4 to 20 years' imprisonment. 720 ILCS 5/9-2(d) (West 2012); 730 ILCS 5/5-4.5-30(a) (West 2012). Aggravated

discharge, as charged here, is a Class 1 felony with a sentencing range of 4 to 15 years' imprisonment. 720 ILCS 5/24-1.2(b) (West 2012); 730 ILCS 5/5-4.5-30(a) (West 2012).

¶ 85    The record shows that defendant had a limited criminal history involving only one DUI conviction aside from the aggravated DUI charge to which he pleaded guilty on the date of sentencing. Defendant did not have a GED or graduate from high school, but worked for 11 years. In mitigation, defendant presented letters from three family members indicating he had rehabilitative potential and would benefit from a supportive family structure upon his release. In aggravation, the State introduced a victim impact statement from the Delgado family, detailing the difficulties that family members endured following Delgado's death, including suicide attempts by his mother and alcohol addiction by his mother's husband. The court, stating that it considered all the factors in aggravation and mitigation in reaching its decision, emphasized that the crime was "horrific" and had significantly affected Delgado's family, and sentenced defendant to concurrent terms of 18 years' imprisonment for second degree murder and 14 years' imprisonment for each aggravated discharge count.

¶ 86    Based on this record, we find that defendant has not demonstrated his sentences were excessive. First, the sentences were within the statutory range, and were not greatly at variance with the purpose of the sentencing statute or manifestly disproportionate to the crime. *Fern*, 189 Ill. 2d at 54. While defendant's sentences are near the upper limit of the relevant range and his criminal history is limited, this does not render the sentences excessive. It is well-established that the seriousness of the crime is the most important factor at sentencing, and the court here permissibly weighed the nature of the crime and its effect on Delgado's family heavily in arriving at the sentence. See *Quintana*, 332 Ill. App. 3d at 109.

¶ 87 Defendant argues that the court did not consider the circumstances of the incident, and claims he was not the aggressor and only discharged the firearm after Delgado attacked Castro. The record demonstrates, however, that the court in fact focused on the circumstances of the incident, and found them aggravating because defendant shot Delgado on a public street then discharged additional rounds at Cabada and Morales as they fled.

¶ 88 While defendant identified mitigating factors, including his family connections, work history, and the fact that he was remorseful in allocution, the court expressly considered all the factors, and was not required to weigh his rehabilitative potential greater than the seriousness of the offense. See *Alexander*, 239 Ill. 2d at 214. Defendant's claim thus amounts to a request that we rebalance the sentencing factors and substitute our judgment for that of the sentencing court, which we cannot do. Defendant's sentence was within the statutory range and based on appropriate factors, and will not be disturbed. *Stacey*, 193 Ill. 2d at 209.

¶ 89 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 90 Affirmed.